**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**


**WILLIE GATEWOOD, ET AL**                                      **PLAINTIFFS**


**VERSUS**                              **CIVIL ACTION NO. 3:07CV82-KS-MTP**


**KOCH FOODS OF MISSISSIPPI, LLC**                              **DEFENDANT**


## MEMORANDUM OPINION AND ORDER

This matter is before the court on a Motion to Decertify and Sever **[#95]** filed on

behalf of the defendant.  The court, having reviewed the motion, the response, the

briefs of counsel, the authorities cited, the pleadings and exhibits on file and being

otherwise fully advised in the premises finds that the motion is well taken and should be

granted.  The court specifically finds as follows:


## FACTUAL BACKGROUND AND FINDINGS

This is a Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), collective action

in which five poultry employees (the "named Plaintiffs")[1] seek to pursue claims on behalf

of approximately 1320 current and former employees (the "opt-in plaintiffs") of Koch

Foods of Mississippi, LLC.  This case is a consolidation of three actions in which the

---

[1]  There were originally seven named plaintiffs.  However, two of the named plaintiffs, Eddie
Kinbrough and Terry Washington, did not work at any of the subject plants and have been dismissed by
order of the court pursuant to an agreement of the parties.  The remaining plaintiffs are Briscoe, Lopez,
King, Davis and Gatewood.

named plaintiffs allege that they are entitled to compensation for "donning and doffing activities," or more specifically, the time it takes them to: (1) obtain and change into and out of certain items of clothing and/or gear; (2) wash their hands and/or some of the items they wear; and (3) walk to and from their workstation before and after work and on break.[2]

The action was conditionally certified as a collective action for the following class: "All individuals employed by Defendant in Mississippi who, during any time period since June 2, 2003, were covered by the FLSA and performed jobs that required them to (I) sanitize themselves and/or (ii) wear, utilize, maintain, and/or sanitize any specialized clothing, gear, or equipment." As stated above, approximately 1320 current and former employees have filed Consent and Joinders seeking to join this action pursuant to the court's Conditional Certification Order.[3]

The plaintiffs seek to recover for various activities associated with their work. Whether any plaintiff is entitled to recover and if so how much, depends on whether each activity is compensable, whether Koch Foods has previously compensated the plaintiff for the time, and the amount of any uncompensated time. Each of these issues is hotly disputed and will require a factual inquiry to resolve at trial. The defendant correctly avers that each plaintiff's claim turns on the details of Koch Foods' and the

---

[2]   The initial action was filed on June 2, 2006. [Doc. No. 1-3:06-cv-301]. On February 9, 2007, the present action and one other were filed by separate counsel. [Doc. No. 1- 3:07-cv-83]. On July 16, 2007, the Court consolidated the three cases. [Doc. No. 344 - 3:06-cv-301]. Two of the three cases have since been administratively dismissed, with all prior proceedings in those cases being merged into this case. [Doc. No. 376 - 3:06-cv-301].

[3]   There were 1677 Consent and Joinders on behalf of named and opt-in plaintiffs filed with the court. Apparently, many of the plaintiffs filed multiple Consent and Joinders. Excluding multiple filings, there are now approximately 1320 plaintiffs attempting to pursue their claims in this case.

plaintiffs' work-related practices.  Although resolution of these issues is not required for purposes of this motion, it is important to fully understand the facts relevant to those practices in order to review the factual differences in each plaintiff's case which the defendant insists necessitates decertification. In an effort to present the relevant facts, the court has reviewed and restates what it considers pertinent in some detail hereinafter.

### Koch Foods' Plants

During the relevant time, Koch Foods has operated four processing facilities: (1) a slaughter plant in Morton, Mississippi ("Slaughter Plant"), where two separate processes take place in which chickens are slaughtered and then chilled, processed, and/or packaged in a variety of ways; (2) a debone plant in Forest, Mississippi ("Debone Plant"), where previously processed chicken breasts and wings are deboned and/or separated into various parts and then marinated, frozen, and packaged in a variety of ways; (3) a prepared foods plant in Forest, Mississippi (the "Forest Prepared Plant"), which operated until May 2007, where previously deboned chicken breasts and tenders were marinated, battered, breaded, fried, and packaged; and (4) a prepared foods plant in Morton, Mississippi (the "Morton Prepared Plant"), which assumed the operations of the Forest Prepared Plant as of May 2007, and to which a portion of the processing activities formerly performed at the Debone Plant were later moved. (LeBlanc Dec. ¶ 2-7;  Hodge Dec. ¶ 2-7; Strength Dec. ¶ 2-8).[4]

---

[4]  All references to exhibits are to the ones attached to the defendant's motion unless otherwise noted.

The evidence presented indicates that each plant operates in a separate facility with different employees under separate management. Each is a complex operation in and of itself and is organized into many different production and support departments that are managed by varied and independent department supervisors.

There are approximately 2150 hourly employees who work in the various departments at the three existing plants. A review of the Consents and Joinders filed reveals that current and former employees from virtually every hourly employee department, many of whom have worked in multiple departments and positions during the relevant time period, are pursuing claims in this case. This information comes from a report from Koch Foods payroll system which reflects the plaintiffs and their departments and is attached as Exhibit A to the Declaration of defendant's employee Bobby Elrod.

**The Slaughter Plant**

The Slaughter Plant has been described as a large facility which operates in two separate divisions: "first processing" and "second processing." (LeBlanc Dec. ¶ 11). First processing consists of: (1) a live receiving and picking room area, where chickens are received and hung on one of two mechanized, single-file production lines entering the plant, then slaughtered and de-feathered; (2) an evisceration area, where four lines of birds (either large or small) are rehung on mechanized lines, eviscerated, trimmed, and inspected in preparation for chilling and further processing; (3) a giblet recovery and packout area, where giblets are obtained, graded, and packaged; (4) a salvage room, where portions of birds partially unfit for sale are trimmed and salvaged for sale; and (5)

a foot room, where chicken feet are graded and processed for sale.  At the end of first processing, the chickens slowly move through a chiller.  (*Id.*, ¶ 11-13).

Second processing begins after the chickens exit the chillers and consists of: (1) a chiller rehang area, where chilled chickens are rehung on multiple mechanized lines for transport to other areas and processed and packaged in various ways; (2) a CVP area, where several lines of whole chickens and/or parts are processed and vacuum packed; (3) a drumstick line, where chicken legs are processed and packaged; (4) a thigh debone area, where chicken thighs are manually deboned, graded, and packaged; (5) the north cooler area, where chicken and parts are further processed and packaged; and (6) the box room, where boxes are made and labeled for use in other areas of the plant.  (*Id.*, ¶ 14-16).  The court has reviewed the map of the plant which is attached as Exhibit B to the LeBlanc Declaration.

The evidence reveals that there are also several plant-wide support departments. These include: (1) sanitation, which works on different shifts responsible for cleaning the plant each day before processing resumes; (2) quality assurance ("QA"), which monitors, inspects, and tests product for wholesomeness and conformity with customer specifications through work performed in the QA office and in the plant; and (3) maintenance, which maintains and repairs all equipment in the plant through work performed in the maintenance shop and in the plant.  (*Id.*, ¶ 18-21).  Other support departments include grounds, rendering, plant monitors, and waste water.  (*Id.*)

Each processing area has between one and four separate departments with day and night shifts and a supervisor for each shift.  (*Id.*, ¶ 11-17).  As well, each support department within each processing area, with the exception of sanitation, also has day

and night shifts, each with a different supervisor.  (*Id.*, ¶ 18-21).  In total, there are approximately 975 employees employed in 26 departments, with approximately 30 supervisors assigned to these various departments.  (*Id.*, ¶ 7-8).  A complete list of departments and an organizational chart of the plant are included in the LeBlanc Declaration at ¶ 7 and Exhibit A.

**The Debone Plant**

The Debone Plant is also a very large facility and operates several different processes, including: (1) ten "cone" lines on which chicken breasts and tenders are deboned and wings are removed; (2) a wing line area consisting of several groups of employees that inspect, process, and package wings; (3) "portion" and "tender" areas, where multiple lines of employees inspect, process and package breasts and tenders; (4) a CVP (*i.e.*, controlled vacuum packed) area, where processed chicken is vacuum packed for shipment; and (5) until January 2008, an IQF (*i.e.*, individually quick frozen) area where parts are marinated, separated, individually frozen, and packaged. (Hodge Dec. ¶ 12).  In January 2008, the IQF operations were relocated to the new Prepared Plant in Morton with different equipment and employees.   (*Id.*).  A map of the plant is attached as Exhibit B to the Hodge Declaration.  The Debone Plant also has several plant-wide support departments including, sanitation, quality assurance, shipping, maintenance, and buildings and grounds departments. (*Id.*, ¶ 14-19).

Each processing area consists of between one and five departments with day and night shifts, each with a supervisor.  (*Id.*).  Other than sanitation, the support departments also have their own supervisors for the day and night shifts.  (*Id.*)  In total,

there are approximately 720 employees employed in 24 departments with approximately 22 supervisors assigned to these various departments. (*Id.*, ¶ 7-8). A complete list of departments and an organizational chart of the plant are included in the Hodge Declaration at ¶ 7 and Exhibit A.

**The Two Prepared Foods Plants**

Until May 14, 2007, Koch Foods operated the Forest Prepared Plant, a smaller facility that consisted of two production lines with: (1) a "front-line" area, where tenders were marinated, placed on a moving conveyer, breaded with breading equipment. partially fried and then frozen; and (2) a "pack-out" area, where the product was packaged for sale. (Strength Dec. ¶ 14). The Forest Prepared Plant also had several support departments, including sanitation, quality assurance, receiving, and maintenance. (*Id.*, ¶ 17). A map of the plant is attached as Exhibit B to the Strength Declaration. Also, each area consisted of one or more departments for both the day and night shifts, each with a supervisor, and the support departments also had their own supervisors. (*Id.*, ¶ 9-10). There were approximately 192 employees employed in 12 departments at the Forest Plant. (*Id.*).

After May 14, 2007, the functions of the Forest Prepared Plant were relocated to a much larger facility in Morton. (*Id.*, ¶ 9). The new facility has four lines, each of which has a "front-line" area and "pack-out" area. (*Id.*, ¶ 14). In addition, beginning January 2008, the fourth line was reconfigured to alternate between its traditional function and the performance of the IQF operations that were discontinued at the Debone Plant. (*Id.*, ¶ 15). A map of the plant is Exhibit B to the Strength Declaration. In addition, the

support departments were also substantially increased in size.  (*Id.*, ¶ 17).  The Morton

Prepared Plant has approximately 461 employees employed in 19 departments with

approximately 17 supervisors.  (*Id.*, ¶ 8-10).  A complete list of departments and an

organizational chart of the plant are included in the Strength Declaration at ¶ 8 and

Exhibit A.


**Clothing Requirements**

Employees who enter a processing area during production hours are required to

wear various combinations of clothing items in addition to their own clothes.  (LeBlanc

Dec. ¶ 23-24; Hodge Dec. ¶ 21-22; Strength Dec. ¶ 23-24).  Slaughter Plant employees

generally are required to wear a smock, hairnet/beardnet, ear plugs, and rubber shoe

covers.  (LeBlanc Dec. ¶ 25).  At the Debone Plant, employees generally are required to

wear a smock, hairnet/beardnet, and ear plugs and at certain times, rubber shoe

covers.[5]  (Hodge Dec. ¶ 23).  The only items required to be worn when entering the

processing area of the Morton Prepared Plant are a smock, hairnet/beardnet, and ear

plugs.  (Strength Dec. ¶ 25).

Not all employees, however, are required to wear these standard items.  For

example, live hanger employees at the Slaughter Plant and others working in the live

receiving area are considered to work outside the processing area and are only required

to wear ear plugs.  (LeBlanc Dec. ¶ 29; 4/2/08 LeBlanc 172:20- 173:9).  As well, the

---

[5].  Rubber shoe covers are worn only when the plant is producing product for export to Russia. During the relevant time period, shoe covers were worn for several months in 2003, from approximately August 2005 to January 2006 by night shift employees only, and from approximately August 2008 to the present. (Hodge Dec. ¶ 23)

building and grounds employees at the Debone Plant work outside the plant and are not required to wear any of these items, except ear plugs when operating certain equipment. (Hodge Dec. ¶ 29). At the Morton Prepared Plant, the research and development employees work outside the processing area testing product where no special clothing is required. (Strength Dec. ¶ 30). Finally, a number of support personnel from each plant, such as maintenance and QA employees, perform work outside the processing area and are only required to wear these items when working in the processing area. (LeBlanc Dec. ¶ 31, 34; Hodge Dec. ¶ 29; Strength Dec. ¶ 30).

The testimony reveals that, depending on their jobs, employees at all of the plants may be required to wear other items. For instance, any employee who handles product must wear rubber or, in some cases latex, gloves. (LeBlanc Dec. ¶ 27; Hodge Dec. ¶ 24; Strength Dec. ¶ 25). Also, although not required in most positions at the various plants, additional items must be worn by some employees who perform certain tasks. For example, employees who use knives or scissors must wear a mesh glove and/or a protective sleeve, depending on the plant and the position. (4/1/08 LeBlanc 167:24-168:5; 4/24/08 Strength 54:1-8) Also, freezer suits and/or jackets are worn by some employees, such as shipping. (Hodge Dec. ¶ 29). Some employees at the Slaughter Plant are required to wear aprons because of the nature of their job. (4/2/08 LeBlanc 182:16-183:2) Beginning in January 2008, the Debone Plant began requiring cone line employees to wear safety glasses. (Hodge Dec. ¶ 25). In April 2009, the Morton Prepared Plant began requiring two job categories on the front-line to wear protective eye glasses. (Strength Dec. ¶ 26; see also Watkins 18:3-5 (sealer in CVP at Debone Plant wears safety glass). Also, bump caps are worn by maintenance

-9-

employees in that plant.  (Griffin 19:23 - 20:21; Strength Dec. ¶ 30).   The court has only stated a few examples from the many presented in the evidence.

Various optional items also are made available for employees who want to wear them, such as plastic aprons, plastic sleeves, and cotton gloves.  (LeBlanc Dec. ¶ 25; Hodge Dec. 26; Strength Dec. ¶ 27).  Some employees are also allowed to choose whether to wear items such as protective eye wear, cotton work gloves, dust masks, rain suits, or bump caps depending on their job.  (*Id.*).  Many of the plaintiffs claim that all of the many combinations of clothing that they wear are required.  However, just as many concede that depending on their job, many of the items they wear are in fact not required, but they instead wear them for their own comfort.


**Washing Requirements**

Employees who enter the processing area of a plant must wash their hands or gloves, if they wear them.  (LeBlanc Dec. ¶ 30; Hodge Dec. ¶ 28; Strength Dec. ¶ 29). How this is done varies by plant.  Most production employees at the Slaughter Plant wash their hands with soap in sinks near the entrance to the processing area, or alternatively, rub their hands with sanitizing fluid obtained from dispensers near the sinks.  (LeBlanc Dec. ¶ 30).  Certain departments, such as those in the thigh debone area at the Slaughter Plant, have dip stations they may use.  (4/2/08 LeBlanc 27:19-28:10)

Until May 2008, employees at the Debone Plant washed their hands with soap and water at sinks located near the entrance to the processing area.  (Hodge Dec. ¶ 28). In May 2008, however, the Debone Plant installed sanitizing equipment that sprays

sanitizing fluid on employees' hands as they pass them through troughs while walking

through the station to their work area.  (*Id.*).  At the Morton Prepared Plant, employees

wash their hands at various sinks located along walls near the entrance to the

processing area. ( Strength Dec. ¶ 29).  At the Forest Prepared Plant, employees

washed their hands at sinks located in various areas in the processing area.  (*Id.*).

**Timekeeping and Compensation Methods**

The testimony presented indicates that the several departments at each plant are

managed by a supervisor, who is responsible for supervising the day-to-day work of the

employees in their department and for controlling the time for which each employee in

their department is paid.  (LeBlanc Dec. ¶ 8; Hodge Dec. ¶ 8; Strength Dec. ¶ 10).

Relevant to the findings this court must make, each plant also uses several different

methods to record paid time.  These methods vary by department, and in many cases,

by employee.  Importantly, whether each employee's paid time includes some or all of

the time associated with obtaining, putting on or taking off clothing, washing, or walking

to and from workstations varies significantly according to the timekeeping method, each

supervisor's practices with respect to the method used, and each employee's practices.

Apparently, all hourly employees at each of the plants swipe a time card at one

or more time clocks near the entrance of the plant at the beginning and end of the day.[6]

(LeBlanc Dec. ¶ 38; Hodges Dec. ¶ 32; StrengthDec. ¶ 33).  The time punches are

recorded in a computer system, known as the "TimeTrak" system, which is used for

---

[6]  In 2008, Koch Foods began using hand scanners. The reference to time cards was used
throughout the memorandums of the parties for simplicity and such usage will be continued by the court.

recording time, attendance, and computing hours worked.  (LeBlanc, Dec. ¶ 37; Hodges

Dec. ¶ 31; Strength Dec. ¶ 32).

Most employees in production departments are paid according to "line-time," less

time for scheduled breaks.  (LeBlanc Dec. ¶ 39-41; Hodges Dec. ¶ 33-35; Strength Dec.

¶ 34-36).  The start times for the pay of employees under this method is typically a set

scheduled time in TimeTrak.  (*Id.*)  The end time is either a set scheduled time in

TimeTrak or a time recorded in TimeTrak by the department supervisor using a

department time card, commonly referred to as the "master" time card.  (*Id.*).  If an

employee arrives late or leaves early, however, the employee is paid either from or to

his individual time punch.  (*Id.*).

Under the pay practices of Koch Foods, specific practices vary by department

and employee.  However, line-time employees working at a workstation on a moving

line are generally required to be at their position ready to work when the first piece of

product arrives at their station, and they are relieved from work when the last piece of

product passes their station.  (*Id*; see e.g. Gavin 40:12-24; 55:23-56:1; 58:13-15 (must

report to line when bird passes)).

Line-time employees who are not working at a workstation on a moving

processing line are required to report to work at a set time and are relieved from work at

a set time or when all production in their department is complete.  (*Id.*; see also Watkins

37:14-38:14 (supervisor may counsel if not on line by scheduled start time).  If an

employee is asked to report to work early or stay late, the time is noted by the

supervisor, and the employee is paid either from or to his individual time punch.  (*Id.*;

*see e.g.* Noble 54:3-5, 19-25; 62:18-64:2; 66:6-13 (paid according to master time card,

except when works later than others on line, in which case is paid according to time recorded by lead person); Castro 64:3-65:15 (paid according to personal swipe at the end of the day when works past master time card)).

However, the evidence also reveals that the manner in which various supervisors manage the start and end of production in relation to the start and end of compensated time for each employee, along with the practices of the employee, dictates the extent to which a line-time employee is paid for time associated with the various activities at issue. The court will discuss this more thoroughly below.

It is clear, however, that many production department plaintiffs are not paid according to line-time. Virtually all production departments include positions, such as "floor persons," "lead persons," "jack drivers," "set up" employees, and others, who are paid from an earlier scheduled time and typically are considered on time for work as long as they clock in no later than their scheduled time and then report to work on the production floor. (LeBlanc Dec. ¶ 39-41; Hodges Dec. ¶ 33- 35; Strength Dec. ¶ 34-36).[7] These employees' break schedules may be different from others in their department, and often these employees are paid until their personal clock-out time because they perform work after regular production. (*Id.*).[8] Therefore, it is clear that some activities about which some of the employees complain, including obtaining items, donning, doffing, washing and walking, may take place on paid time. As will be

---

[7]  *See e.g.* Bramlette 42:22-43:1 (debone floor person and wash station employees); Vaughn 131:19-134:23 (thigh debone support); Griffin 32:15-19 (bagger operator); 57:4-5 (floor person); Norris 75:10-76:4; 89:12-13 (marination operator); Hardy 68:25-69:8; 102:3-5 (lead person on cone line).

[8]  *See also* Vaughn 131:19-134:23 (thigh debone support personnel paid to personal punch); Griffin 40:3-5 (bagger operator paid to personal punch); Hardy 40:10-11 (DeBone Plant lead person receives 45 minute breaks).

discussed later, this is another complicating factor in the determination the court must make as to whether the named plaintiffs are sufficiently "similarly situated" to the opt-in plaintiffs to allow this matter to proceed as a collective action.

Further, the various plant support departments are also different. Employees in these departments typically work set scheduled shifts, the hours of which are set in TimeTrak for each employee. (LeBlanc Dec. ¶ 42-43; Hodge Dec. ¶ 36-37; Strength ¶ 37-38). Importantly, employees in many of these departments start and end their day in areas where no special items must be worn, such as the maintenance shop or the QA office, and are considered on time for work if they clock-in by their scheduled start time. Therefore, activities at issue may take place on paid time.[9] The breaks given to these employees may also differ depending on the department, and breaks may begin and end in areas where no special clothing must be worn.[10]

Employees in some departments are also paid differently based on the terms of the applicable Collective Bargaining Agreements ("CBA"). For example, under the Slaughter Plant's CBA, the thigh deboners in this plaint are paid for each pound of meat they process, rather than being paid by the hour. (*See CBA* (Slaughter), Appx. B). In addition, under each plant's CBA, sanitation employees are compensated under an

---

[9]  Even some production employees start and end their day in areas where no special clothing is required to be worn. (*See e.g.* Stewart 24:6-12).

[10]  *See e.g.* King 119:3-23; 70:16-71:2; 124:15-1 (Slaughter Plant maintenance employee begins and ends outside processing area); V. Patrick 63:18-67:13; 42:3-45:15) (QA lead person at Morton Prepared Plant started/ended break in QA office, but at Forest Prepared Plant started/ended break on floor); (LeBlanc Dec. ¶ 43 (Until February 22, 2009, Slaughter Plant maintenance employees had only one unpaid 30 minute break deducted from paid time, but received two 30 minute breaks); see e.g. King 120:18-21 (testifying maintenance breaks vary between 30-45 minutes); V. Patrick 63:18-67:13; 42:3-45:15) (testifying QA employees at the Forest Prepared Plant took two 30 minute breaks at times different from other employees).

incentive-based pay system in which they are paid for 8 hours daily work, even if they work less than 8 hours.  (*See* CBAs, Appx. B)

Importantly for purposes of this motion to decertify, many plaintiffs have worked in various departments during the relevant time and in various positions within different departments.  Therefore, they have worked under different supervisors and under different timekeeping methods for various periods of time.


**The Named Plaintiffs**

The seven originally named plaintiffs have worked at only three of the four plants, and each in different departments.  Three of the plaintiffs – Briscoe, Lopez and King – are employees at the Slaughter Plant.  Briscoe works as a trimmer in one of the evisceration departments.  (Briscoe18:12-19:1).  Lopez works in the thigh debone department as a cutter.  (Lopez 10:18-11:6).  King works in the maintenance department.  (King 25:1-20).

Plaintiff Amy Davis works as a lead person in one of the pack-out departments at the Morton Prepared Plant.  (A. Davis 31:20:32:1).  Gatewood works as a box packer in one of the other pack-out departments at the Morton Prepared Plant.  (Gatewood 44:2-6).  None of them work at the Debone Plant.  As previously stated, two of the seven – Kimbrough and Washington – have never been employed at any of the subject plants and have already been dismissed.  It is readily apparent that the named plaintiffs have worked in divergent employment settings and have varying claims as a result of their work in different plants, in different departments, in different jobs, and under different pay practices.

**The Plaintiffs' Claims**

Although the Amended Complaint alleges only donning and doffing claims, discovery and the evidence presented to the court reveals that numerous plaintiffs are asserting claims for allegedly unpaid work time unrelated to those claims.  For instance, several plaintiffs in various departments contend that they are not being paid for both donning and doffing practices and actual work time based on the differing practices of their individual supervisors or department heads.  As pointed out by the defendant, these supervisors and other witnesses may or may not agree with the evidence offered by the plaintiffs in this regard.  Of course, the veracity of the evidence is not at issue in the present motion.  It is, however, undeniable at  this stage that the plaintiffs' claims are widely divergent depending on the plant, the department, the supervisor, and the plaintiff.  As an example, many plaintiffs claim that they are not paid for actual production work they perform because of the manner in which the supervisor for their department swipes the master time card.  The precise nature of these claims depends on the alleged practice of the supervisor for the department.

Seventy-four of the over 1300 plaintiffs have been deposed, and the above examples cited by the court are presented by the defendant as only a sampling of the volumes of testimony taken thus far.  The defendant contends that numerous others in the putative class have claims for varying relief and some of which are wholly unrelated to the donning and doffing issues alleged in the Amended Complaint addressed by the court's conditional certification order.  As a result of these allegedly widely disparate claims, each based on alleged circumstances specific to their own claims, the defendant contends that the plaintiffs cannot be considered "similarly situated" as is required to

maintain a collective action under the FLSA.

**Varying Pay Practices**

As previously alluded to above, it is clear from the evidence that different timekeeping and compensation methods exist  among the various departments at each plant in which the various plaintiffs work.  Equally as important, however, the defendant points out certain disparate practices which exist among supervisors for how those methods are implemented with respect to a particular department.  This is true with respect to each method of timekeeping and pay.

The evidence shows that among production departments that pay according to line-time, supervisor practices differ in the manner that the supervisor starts and ends the work within the department and in the manner in which the paid time for the employees is recorded.  These divergent practices affect the amount of time spent on the activities at issue that occurs on paid time.

For example, the supervisor of one of the day shift, front-line departments at the Morton Prepared Plant begins the production of the department by first swiping the master timecard in the break room at the scheduled start time for the department, which is the time the line-time employees in his department begin getting paid.  (Allen 65:4-17).  He then walks to the production floor to inspect the line and start the line.  (*Id.*).  Employees of the department are in the break room when he swipes the card and travel to their workstations putting on the items they wear as he travels to the production line to start the equipment on the line.  (*Id.*, 63:22-64:15; 141:21-142:5).  At the end of the shift, the supervisor stops the production line and walks to the time clock in the break

room. Once the tender layers on the processing line arrive at the clock in the break room, he swipes the master badge to end the pay time for the department. (*Id.*, 101:2-104:7; see also T. Patrick 57:17-58:2 (tender layer testifying to same)).

This same individual also supervises the beginning of the shift for the pack-out department on the line, which is the department after the freezer.[11] (Allen 60:5-9) To allow the product to travel through the front-line and exit the freezer, the start time for the pack-out employees is 6:30 a.m., but it actually takes between thirty-two and thirty-five minutes before the product exits the freezer. (*Id.*, 60:7- 9; 91:23-92:18). Another supervisor punches the master time card for the end of paid time for the pack-out employees. (*Id.*, 104:11-15:1). That supervisor waits until the pack-out employees have left the line and arrived at the time clock to swipe them out. (Thweate 113:19-114:16). As a result of these practices, it appears to the court that the line-time employees in these departments perform the activities at issue at the beginning and end of the day on compensated time, some in varying degrees depending on their own practices and their location on the line.[12]

Other production line departments operate differently. Employees working in the day shift evisceration line department at the Slaughter Plant begin getting paid at 5:57

---

[11] Named Plaintiff Willie Gatewood has worked in one of pack-out departments since September 2007. (Gatewood 44:2-7). Prior to that time, he was a floor person. (*Id.*, 43:6-44:4).

[12] These departments also have several set up and lead employees that are not line-time employees. Named Plaintiff Amy Davis has been a lead person in one of the pack-out departments since 2007. (A. Davis 31:23-32:9; 121:6-16). These employees have an earlier scheduled start time and are paid to their own individual punch out time at the end of the day. (Allen 61:24- 64:7; 101:20-23). Also, certain production employees are sometimes paid until the employee punches out because they may stay late performing work in the pack-out portion of the line or other duties. (Allen 82:23-83:10).

A.M.[13]  (Carr 15:9-22).  Their supervisor, however, requires only that the employees

arrive at the line by 6:00 A.M., when the line begins, or later depending on when the

product arrives at their station on the line.  (*Id.*, 15:23-16:1, 29:4-15; Carr Dec. ¶ 6;

Arnold 18:5-8).  As a result, employees in this department are compensated at least

three minutes of time at the beginning of the shift during which activities at issue take

place and possibly more depending on their own practices.  The supervisor has a

different practice for the end of the shift.  He swipes the master time card to end the pay

time of the employees when the product passes a certain station on the line.  (Carr Dec.

¶ 7-8).

Other production department supervisors have different practices from even

those divergent practices cited above.  For example, the supervisor of the night shift

thigh debone and thigh debone support departments at the Slaughter Plant supervises

several categories of employees.  First, he supervises a few set up employees that

begin working at scheduled start times earlier than the beginning of production. (Vaughn

23:9-25:6).  These employees are considered on time if they clock in no later than their

scheduled start time and then travel to the floor to begin work.  (*Id.*, 133:7-16).  They are

paid until their individual punch out time.  (*Id.*, 134:3-23).

That, however, is not the case with respect to thigh debone support employees

he supervises.  Those employees' pay begins at the same time production is scheduled

to begin.  The supervisor expects those employees to be at their workstation at their

scheduled start time, but they are paid until their individual punch out.  (Vaughn 58:6-

---

[13]  Since July 2007, named Plaintiff Emma Briscoe has worked in the evisceration department on
the night shift. (Briscoe 12:24-13:6; 18:23-24; 51:10-11; Elrod Dec. ¶ 6).

60:25; 83:2-85:21; 116:11-19; 134:3-23).  Still different are the thigh debone cutting employees he supervises.  They work the 11:00 P.M. to 8:00 A.M. shift, but are paid by the pound of meat they produce.[14]  (*Id.*, 39:8-15; 59:1-60:4; Slaughter Plant CBA, Appx. B).

Therefore, although this supervisor swipes a master card for these employees, they may leave the line and arrive at the clock at the same time or even before the master card is swiped at the end of the shift, resulting in those employees being compensated for doffing, washing or travel time.  (Vaughn 131:19-135:21; *see also* Lopez 13:8-13 (testifying night shift cutters leave the line at 15 minutes before 8:00 and others at 5 minutes before 8:00)).

The court finds that substantial differences also exist relating to the paid time of production employees who are not paid using line-time.  Some of these plaintiffs have testified that they are only required to clock in no later than their scheduled start time and therefore may perform the activities at issue on compensable time.  For example, Bruce Parrott, a floor person on the cone lines at the Debone Plant, testified that he is paid for these activities because of his practices and the practices of his supervisor. (Parrott 41:15-22, 67:14-21).[15]

Others, however, have testified that they are required to have obtained and put on their clothing, washed their hands, and arrived in their work area by their start time

---

[14]  Named Plaintiff Mardoquo Lopez is a thigh debone cutting employee on the day shift.

[15]  *See also* Hardy 68:25-69:8; 102:3-5 (paid according to scheduled start time and is on time if clocks in by that time); R. Davis 14:7-9; 22:5-7; 23:19-24 (ice house worker puts on all items when arrives at ice house at start time); King 65:10-12 (maintenance employee on time if clock in by scheduled start); 12/5/08 Young 13:17-20; 14:1-7; 28:5-15; 25:1-10; 44:21-45:8 (must be in supervisor's office getting supplies at 6 a.m., but travels outside to office)).

and, therefore, are allegedly not compensated for these activities.  (Drake 27:5-7; 31:11- 16; A. Davis 98:21-99:4; Johnson 34:12-14; Stowers 52:3-4-22; 29:16-24). James Griffin, an employee who has worked in several different positions during the relevant time period at the two prepared foods plants explained in his deposition that this practice differed by department.

As Juliette Bramlette, a floor person at the Debone Plant explained, "[d]ifferent supervisors have different rules."  (Bramlette 58:4-6).  When considering the disparate pay practices used among the various operations of Koch Foods, the defendant contends that one fact becomes clear, *i.e.*, that just as there are widely varying claims being pursued by the plaintiffs, there are widely divergent pay practices relevant to whether the plaintiffs should be entitled to recover for some or all of the activities at issue.


**Varying Clothing Practices**

As to what protective clothing must be worn by each employee,  the testimony reveals that the precise nature of an employee's job, along with an employee's individual preferences, dictate what an employee wears.  (LeBlanc Dec. ¶ 24, Hodge Dec. ¶ 22, Strength Dec. ¶ 24).  Plaintiffs in the putative class have testified to widely varying clothing practices.  In addition, the depositions of the plaintiffs also reveal wide variances in the practices for obtaining, donning and/or doffing the items.  As one plaintiff observed, "[n]o one person wears the exact same thing."  (A. Davis 127).  For example, in addition to the standard items required at each plant, some employees allegedly are required to wear aprons.  (*See e.g.* Drake 36:8-10 (claiming apron is

required for her position)).  Others – even in the same department as those that do wear aprons – do not wear aprons.  (*See* J. Gilmore 77:20-23).

The same is true with respect to sleeves and other items.  (Boatman 28:8-10 (does not wear sleeves); A. Jones 23:3-7 (chooses to wear cotton glove under guard with latex glove on top)).  Some employees have testified to wearing multiple pairs of gloves, or multiple hairnets, even though they are not required.[16]  Some, because of the nature of their job, wear virtually whatever they choose, such as live hangers at the Slaughter Plant. (4/2/08 LeBlanc 172:16-173:9).  Indeed, the various combinations of items worn by employees are numerous and vary by position and by employee as a review of virtually any deposition presented to the court demonstrates.

Also central to the plaintiffs' claims are the manner in which they obtain, put on, and/or wash the items.  With the exception of the smock, employees may take home the various items that they may wear, such as gloves, aprons, or sleeves.  Slaughter Plant employees obtain most of these items on Mondays and may exchange them as needed throughout the week.  (*See e.g.* A Jones 25:10-14; Morris 22:12-23:10; 40:19-42:1, 42:6-14 (takes knives and arm guard home).  Employees of the Prepared Plants obtain the items as needed.  (Strength Dec. ¶ 28; *see e.g.* L. Gray 44:18-25).  Some obtain them at the end of the shift and choose to put on some of the items before arriving at the plant.  (*See e.g.* Watkins 60:9-19; Denson 33:12-23, 81:8-10 (wears hairnet, shoe covers, and ear plugs from home); Drake 35:15-17 (some wear hair nets from home)).

---

[16]  *See e.g.* Harris 20:2-8; 33:12-34-13 (wears two hairnets, two pairs of cotton gloves, and two pairs of rubber gloves as a sawer, but not in past positions); Morris 43:12-20 (wears two pair of cotton gloves, arm guard, and plastic glove on top); Gatewood 173:5-173:19 (chooses to wear cotton gloves under latex for comfort)) Moreover, some employees may choose to wear additional items such as rain suits at certain times. (Hardy 52:8-9, 53:15-19.).

Others obtain these items at the beginning of the shift and may slip them on as they are walking to the production floor or at their workstation.  (*See e.g.* Gavin 28:5-10 (can put on gloves and apron on the floor)).  Depending upon the time in which the individual arrives at work, various plaintiffs have testified to having to wait in lines to obtain the items, while many others have testified that no lines or waiting time is encountered.[17] (*See e.g.* Ealy 25:25-26:12 (lines vary); 12/5/08 Young 30:3-5 (claims 20-30 minute line)).

If an item is re-used from a previous work day it must be clean. Some employees wash these items at home, but others wash or rinse them before or after their shift.[18]  As a result, like the plaintiffs' claims relating to clothing requirements, varying claims have been made about whether employees are required to wash any of their items depending on what items they wear and whether they are performing a job that soils the items. (*Id.*; Stewart 36:5-8 (never required to wash items); Morgan 58:21-59:3 (no need to wash apron as a stacker)  Indeed, the testimony concerning these issues varies dramatically across all of the many depositions that have been presented to the court.

---

[17]  Also, varying claims have been made about washing or sanitizing hands before working. These claims vary depending on each employee's start and break times, department and plant because of alleged lines and the various alternatives for hand washing. (Stewart 36:25-37:17 (never required to wash hands); Griffin 44:11-22 (no lines to wash before work, but lines to wash at break); Stowers 33:7-12 (30 seconds to 1 minute to wash hands properly); Henderson 30:13-31:6 (only a few seconds to "dip" hands in sanitizer); Watkins 29:17-32:17 (plant installed sanitizer 1½ yrs ago – takes seconds to sanitize; before that, washed hands, put on gloves, and washed again).

[18]  *See e.g.* Bramlette 67:17-70:14 (washes apron at home, unless obtains a replacement at end of shift); C. Jones 69:23-70:3 (explaining can wash items at home); Wesley 44:3-7 (same); Noble 58:11-59:12; 60:4-7; 79:25-80:16 (washes gloves and apron before leaving plant rather than at home); Norris 63:19-22 (not required to wash any items); Ealy 83:25-:84:3 (no need to wash any item on spiral line at Debone Plant); Gavin 24:7-22 (washes apron and shoe covers at end of shift); Hamilton 63:14-20 (washes apron, gloves, boots, and guard at the end of shift)).

**The Plaintiffs' Union Status**

One of Koch Foods' defenses to the plaintiffs' claims is § 203(o) of the FLSA.  29

U.S.C. § 203(o).  The court has previously held that this provision excludes from

compensation time spent by Union-represented plaintiffs changing clothes and washing

before and after each shift. [Doc. No. 62-3:07-cv-82]  The court held, however, that not

all plaintiffs are subject to this defense.  [*Id.*, 18 n. 19, 24].  First, the CBAs do not apply

to all categories of plaintiffs.  Instead, the CBAs apply only to hourly production

employees and maintenance and sanitation employees.  QA and other non-production

employees are not covered by the CBAs.  [*Id.*].

In addition, the Prepared Plants and the Debone Plant were not unionized until

2004, and there was no CBA in place at those plants between June 3, 2003, the earliest

possible beginning day for the limitations period in this case, and September 21, 2004,

the date on which the first CBA was executed that  applied to the Prepared Plant and

the Debone Plant.  [Doc. No. 62-3:07-cv-82, p. 18 n. 19, 24].  Therefore, a portion of the

claims of some of the plaintiffs are not subject to the § 203(o) defense depending on the

plant in which they were employed, the dates of their employment, and the dates that

they filed their Consent and Joinder attempting to join this suit.

Finally, many of the plaintiffs have testified that they are not members of a union

and, therefore, are not subject to the  defense.  (*See e.g.* Arnold 43:20-21; Harris 95:8-

9; K. Lofton 55:22-23; Morgan 95:4-5; Blankenship 50:7-8; Castro 65:17-18; Hamilton

98:60-7; V. Patrick 71:12-13; K. Smith 54:5-6; Stewart 54:13-14).  As a result, various

plaintiffs are excluded from coverage from the relevant CBAs entirely, or for varying

time periods, giving rise to different, conflicting defenses, according to the defendant.

## LAW AND ANALYSIS

### Similarly Situated

The central issue in this dispute is what "similarly situated" means in the context of the FLSA.  The FLSA, provides that a person may maintain an action on "behalf of himself ... and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  29 U.S.C. § 216(b). The main difference between FLSA representative actions and a Fed.R.Civ.P. 23 class action is that the FLSA actions follow an "opt-in" rather than an "opt-out" procedure. *See La Chapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 289 (5th Cir.1975).  However, in discussing the representative action, most courts often utilize class action terminology from Rule 23 cases, thus blurring the lines of distinction between the two.  However, those lines are very important to maintain and crossing them leads to confusion.

Similarly situated is not defined in the statute and continues to search for a meaning in the cases reviewing collective actions.  What is apparent, from the many cases dealing with the subject, is that two distinct methods have developed for dealing with the issue.  The first line of cases is typified by *Lusardi v. Xerox Corp.* 118 F.R.D. 351 (D.N.J.1987), *mandamus granted in part, appeal dismissed*, *Lusardi v. Lechner*, 855 F.2d 1062 (3rd Cir.1988), *vacated in part, modified in part, and remanded*, *Lusardi v. Xerox Corp.*, 122 F.R.D. 463 (D.N.J.1988), *aff'd in part, appeal dismissed*, *Lusardi v. Xerox Corp.*, 975 F.2d 964 (3rd Cir.1992).  *Lusardi* and its progeny define the

requirement by virtue of the factors considered in the "similarly situated" analysis.[19]  *See*

*Mooney v. Aramco Service Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995)*(overruled in part on*

*different grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156

L.Ed.2d 84 (2003)).[20]

Pursuant to the analysis advanced in *Lusardi*, a representative class is not one of

a particular form but rather approached on an *ad hoc* analysis on a case by case basis.

*See id.*  This is the approach adopted by this court and numerous others in dealing with

---

[19]  Four factors were named as the primary reasons for the initial decertification of the *Lusardi* class. *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D.N.J.1987),

> For several reasons, including (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to Xerox which appear to be individual to each plaintiff; (3) fairness and procedural considerations; and (4) the apparent absence of filings required by the ADEA prior to instituting suit, the class will be decertified.

On remand, the *Lusardi* court examined a variety of factors, and again decided to decertify the class.

> The members of the proposed class come from different departments, groups, organizations, sub-organizations, units and local offices within the Xerox organization. The opt-in plaintiffs performed different jobs at different geographic locations and were subject to different job actions concerning reductions in work force which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis. This case should not continue in a class status.
>
>  ....
> There is no commonality amoung [sic] the people who were subject to more than sixty-five separate reductions in force, virtually all of which occurred at separate points in time. In the absence of one corporate wide reduction in force, about all that the members of the proposed class have in common is their termination and age within the protected range. The disparate individual defenses asserted by Xerox heightens the individuality of the claims and complicates the significant management problems.

*Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 465-66 (D.N.J.1988) (citations omitted).

*Mooney v. Aramco Service Co.*, 54 F.3d at 1213, FN 7.

[20]  *Lusardi* and *Mooney* both deal with the ADEA.  However, as recognized in *Mooney*, the ADEA at 29 U.S.C. § 626(b) specifically incorporates section 16(b), (29 U.S.C. § 216(b)) of the Fair Labor Standards Act.  *Mooney v. Aramco Service Co.*, 54 F.3d at 1212.  Therefore, the "similarly situated" analysis for purposes of collective actions is identical.

collective actions under the FLSA.  Under this *ad hoc* analysis, the "similarly situated" inquiry is a two-step one.  The court makes the first determination of similarly situated at the so-called "notice stage."  At the notice stage, the court makes a decision based only on the pleadings and any affidavits which have been submitted whether notice of the action should be given to potential class members.  The court made that determination and ordered a conditional certification.

This conditional certification was made based on minimal evidence and, thus, a fairly lenient standard was utilized.  The putative class members were given notice and the opportunity to "opt-in."  Approximately 1320 such opt-in plaintiffs have chosen to join the named plaintiffs in this action.  The action has proceeded as a representative action throughout discovery.

The second determination under the *Lusardi* template is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial.  At this state, "[d]ecertification scrutiny requires the Court to look beyond the pleadings and affidavits; instead, the Court must determine whether the potential plaintiffs are similarly situated in light of all information gathered during the post-opt-in discovery."  *Gallender v. Empire Fire & Marine Ins. Co.*, No. 5:05cv220-DCB-JMR, 2007 WL 325792, *2 (S.D. Miss. Jan. 31, 2007).[21]

---

[21]  Since the court has chosen to use the *ad hoc* approach set out in *Lusardi* to manage this case, the second method of handling collective action cases, the so-called Spurious Class Action, will be discussed briefly only for illustrative purposes.  As stated succinctly in *Mooney*,

The second line of cases is typified by *Shushan v. University of Colorado*, 132 F.R.D. 263 (D.Colo.1990). *Shushan* espouses the view that § 16(b) of the Fair Labor Standards Act (FLSA) merely breathes new life into the so-called "spurious" class action procedure previously eliminated from Fed.R.Civ.P. 23. Building on this foundation, the court determined that Congress did not intend to create a completely separate class action structure for the FLSA and ADEA context, but merely desired to limit the availability of Rule 23 class action relief under either Act. In application,

Indeed, at the present stage of this litigation, the court has much more information upon which to make a factual determination on the similarly situated question. If the court concludes that the claimants are similarly situated, it will allow this representative action to proceed to trial. If the court concludes that the opt-in plaintiffs are not similarly situated to the named plaintiffs, the court would be compelled to decertify the conditional class, and the opt-in plaintiffs will be dismissed without prejudice. At that point, only the class representatives -*i.e.* the original named plaintiffs- will proceed to trial on their individual claims, perhaps severed if the court determines to do so.

As stated above, the FLSA does not define the term "similarly situated," but courts considering the issue generally look to whether the proposed class members are similarly situated "with respect to their job requirements and with regard to their pay provisions." *Brooks v. BellSouth Telecomm., Inc.*, 164 F.R.D. 561, 568 (N.D. Ala. 1995) (quoting *Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1568 (11th Cir. 1991)); *Tucker v. Labor Leasing, Inc.*, 872 F. Supp. 941, 947 (M.D. Fla. 1994) (citing *Riojas v. Seal Produce, Inc.*, 82 F.R.D. 613, 616 (S.D. Tex. 1979)).

It is true that the plaintiffs need only be "similarly situated" not identically situated. *See Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001)(Plaintiffs

---

the court determined that Congress intended the "similarly situated" inquiry to be coextensive with Rule 23 class certification. In other words, the court looks at "numerosity," "commonality," "typicality" and "adequacy of representation" to determine whether a class should be certified. Under this methodology, the primary distinction between an ADEA representative action and a Fed.R.Civ.P. 23 class action is that persons who do not elect to opt-in to the ADEA representative action are not bound by its results. In contrast, Rule 23 class members become party to the litigation through no action of their own, and are bound by its results.

*Mooney v. Aramco Service Co.*, 54 F.3d at 1214.

"need show only that their positions are similar, not identical, to the positions held by the putative class members").  Some courts who view the similarly situated requirements of § 216(b) as more liberal than Rule 23 (class action), Rule 20 (joinder) and Rule 42 (severance), have found the existence of a company wide policy affecting all employees is unnecessary to support a collective FLSA claim.  *See, e.g., Falcon v. Starbucks Corp.*, 580 F.Supp.2d 528, 530 (S.D. Tex. 2008) (rejecting requirement of a common policy or plan and holding that "there must be 'meaningful' identifiable facts or [a] legal nexus that binds the claims").  See also *Hipp*, 252 F.3d at 1219; *Grayson v. K-mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996)[22]; *Douglas v. GE Energy Reuter Stokes*, No. 1:07-CV-077, 2007WL1341779, *7 (N.D. Ohio April 30, 2007).

Nevertheless, it appears that no court has yet expressly adopted an explicit and readily applicable standard for decertification.  However, other circuits adopting the *ad hoc* two-tier approach to certification utilized by this court consider a number of factors in determining whether members of a conditionally certified class are similarly situated. One authoritative case relied upon by many courts is *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001).  In discussing the determination of similarly situated in the context of a collective action, that court found the following  factors to be of considerable importance: "(1) disparate factual and employment settings of the

---

[22]    *Grayson* concerned claims of age discrimination with a broad policy applied to a discreet group of employees (i.e. older store managers) emanating from the highest levels of the defendant corporation, control of which was not in dispute. 79 F.3d at 1097-99. *Hipp* was similar in this regard. 252 F.3d at 1219 (noting that, "[l]ike the plaintiffs in *Grayson*, ... Plaintiffs in this case all held the same job title, and they all alleged similar, though not identical, discriminatory treatment"). Finally, and importantly, both *Hipp* and *Grayson* sought to determine whether the district court abused its discretion when it certified a collective action, not, as in this case, considering whether to decertify a collective action.  *See Anderson v. Cagles, Inc.*, 488 F.3d 945, 954, FN.10 (11th Cir. 2001).

individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Id.* at 1103.

In fact, the *Lusardi* court decertified a conditionally certified collective action under the ADEA, which as stated above, is similarly governed by FLSA § 16(b), after considering each of the factors set forth in *Thiessen*. The *Lusardi* court, applying the factors set forth above, found that, just as in *Thiessen*, there was "no commonality among the [named] plaintiffs and the sample [opt-in plaintiff] group." *Lusardi*, 118 F.R.D. at 359.

Indeed, after extensive discovery, not only did the *Lusardi* court have serious concerns about the fairness and manageability of the proposed collective action, it was evident that the factual and employment settings of the plaintiffs were far too varied for trial before a single jury:

> Because it appears the members of the proposed class come from different departments, groups, organizations, suborganizations, units and local offices, as well as different subsidiaries of Xerox, performed different jobs at different geographic locations, were the subject of different job actions concerning reductions in the Xerox work force . . . which occurred at various times as a result of decision by different supervisors made on a decentralized employee-by employee basis, plaintiffs are not similarly situated.

*Id.* at 352. In refusing to allow the claims of all 1325 Xerox salaried employees to be tried together, it was critical to the court's reasoning that there was no single adverse employment decision giving rise to each of the claims. *Id.* at 359, 361.

On remand, the *Lusardi* trial court again held decertification proper. The court emphasized the differences in the plaintiffs' jobs, their work locations, and the work actions about which they complained and the lack of any single company-wide reduction

in force.  *Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 465 (D.N.J. 1988).  "The described

downsizing of the Xerox work force was implemented and managed at the local level.

The local management assessed its particular work force needs, consistent with

corporate policy.  Accordingly, a reduction differed not only from [Xerox] organization to

organization but also from manager to manager . . . ."  *Id.* at 466.  Thus, the court

concluded that the plaintiffs' claims were premised on far different facts that could not

be established by means of class-wide proof.

Likewise, the defendant argues that this action should be decertified because it

allegedly encompasses claims dependent on widely varying employment and factual

settings such that the remaining five named plaintiffs cannot adequately represent the

class members at a single trial.  The defendant continues by asserting that more than

1300 employees have opted-in to this action and many of the employees have

performed varying jobs requiring differing clothing and who worked for different

supervisors among numerous departments, on different shifts, across four separate

plants in the relevant time frame.  A further complicating factor, according to the

defendant, is the fact that many individual plaintiffs have worked in numerous different

positions, some at different plants, during their individual tenures with the defendant.

Another case relied on strongly by the defendant is *Anderson v. Cagle's, Inc.*,

488 F.3d 945 (11th Cir. 2007).  *Anderson* is similar to this case in that it involved a

conditionally certified class of approximately 2,200 poultry employees where the trial

court granted the defendants' motion to decertify, based largely on the differences in the

plaintiffs' work experiences.  *Id.* at 954.  Upholding the decertification order, the

appellate court detailed the district court's finding that because of the "wide variety of

work assignments and varied compensation structures affecting the purported class," the named plaintiffs could not adequately represent the class. *Id.* Among the factors contrasted by the trial court in its decertification analysis were the various locations and work forces represented, the various compensation methods employed by the defendants, and the differing protective clothing the putative class members were required to wear." *Id.* Much as in *Lusardi*, the substantial factual differences present in *Anderson* made class certification inappropriate.

Still another case relied on by the defendant is *Fox v. Tyson Foods*, No. 4:99CV1612, 2006 WL 6012784 (N.D. Ala. Nov. 15, 2006). The *Fox* court did not utilize the two-tiered *ad hoc* approach to certification used by this court, but instead refused to certify the FLSA claims of a similar proposed class of 250,000 chicken processors in the first instance after extensive discovery.[23] Of particular importance in the court's decision was the finding by the court that the "current and former Tyson employees are distinct from one another in that they are or were employed, over a period of roughly nine years, in different positions, with different pay grades, at different plants, on different lines, and in multiple states." *Id.* at *5-6. The *Fox* court further reasoned that "adjudication of this action is not manageable or appropriate given the evidence before the Court regarding inter-plant and intra-plant inconsistencies as well as the obvious differences among the members of the proposed class." *Id.* at *6.

In this case, the putative class encompasses employees working in four different

---

[23] The named plaintiffs' original complaint was filed in 1999, before the two-tiered approach was adopted by the Eleventh Circuit. At the time of the court's decision on class certification, the parties had engaged in discovery on the merits for some six years.

physical locations, numerous different departments, during three different shifts, over a period of six years, performing a wide variety of job duties. The maintenance of a collective action is complicated further by the fact that most plaintiffs have worked in multiple positions, departments, and for numerous supervisors who had differing techniques for logging work time. It is therefore not possible to fairly determine whether, and to what extent, they have been allegedly under-compensated on a class wide basis.

The plaintiffs' testimony makes clear that they, as a class, are not required to wear the same clothing, nor do they follow the same donning and doffing practices. In fact, the plaintiffs admittedly put on different items, at different times, in different places, all depending on their job duties and their own personal practices and preferences. Further, discovery has shown that the differences in the plaintiffs' work environments make the use of class-wide proof inappropriate. Not only do the physical layouts of the plants differ dramatically, but the facilities follow differing practices with regard to the distribution of protective clothing and the available means of washing/sanitizing hands and equipment. Some of the plaintiffs have testified that they even carried protective clothing home and washed it and returned to work either wearing it or putting it on before the shift was to start. Such differing practices will require individual proof with respect to activities at issue and the amount of time for which each individual plaintiff is seeking to recover.

However, even more critical to this court's decertification decision is the fact that the plaintiffs themselves admit that they were not subject to a single pay practice. The court recognizes that it has previously found that a "custom or practice" of non-compensation existed at the defendant's plants so as to justify the invocation of the 29

U.S.C. § 203(o) defense in relation to employees who were covered by a valid CBA. That finding was based upon the evidence available at the time of that decision and is limited to the decision of the court related only to the issue of the defense presented. It does not bind this court to an ultimate conclusion that a single company-wide policy of non-compensation for the complained of deficiencies in compensation practices existed when determining whether the named plaintiffs are similarly situated to the putative class members. This is one of the detriments of piecemeal litigation and certainly, a disadvantage of the *ad hoc* two-tiered approach to handling collective actions.[24]

However, as discussed more fully above, the putative class members have been shown to be subject to a number of differing timekeeping and compensation practices — practices determined by their specific positions, departments, and supervisors. Even within individual departments there are substantial differences. In addition to the variance in compensation practices, supervisors implement varying practices with regard to managing the work in the department and determining the paid time of each employee. Thus, varying pay decisions "implemented and managed at the local level" cannot support class-wide recovery under the FLSA. *See Lusardi*, 122 F.R.D. at 465.

Further, many plaintiffs have testified that they are seeking recoveries for additional or different claims from those pled by the named plaintiffs. For example, many claim that they are not paid for actual production time because of the manner in which their supervisor swipes the "master card." Others seek recovery for allegedly

---

[24] While the evidence presented previously supports the court's determination that the fact of non-compensation for donning and doffing satisfied the requirement of a "custom or practice" under § 203(o), it does not satisfy the requirement that the named plaintiffs be "similarly situated" with the putative plaintiffs to permit a collective action to proceed. Reliance on a class definition drafted so broadly as in this case is a detriment to collective treatment of the various claims presented by the myriad plaintiffs.

uncompensated production work performed during scheduled breaks.  These discrepancies support the court's conclusion to decertify the class.  *See, e.g., Stone v. First Union Corp.*, 203 F.R.D. 532, 543 (S.D. Fla. 2001) (When a Section 216(b) collective action "includes individuals who assert a variety of claims, many of which have not been asserted by the representative Plaintiff," it should be decertified.).

The divergent circumstances presented by the proof adduced emphasizes the necessity of introducing individualized proof on liability and damages, proof which the named plaintiffs would find difficult or impossible to offer on a class-wide basis.  None of the named plaintiffs have worked in the Debone Plant and all have worked for varying departments and in varying plants.  As a result, the factual and employment settings of the named plaintiffs differ significantly from each other and each has been subject to clothing and pay practices distinct from the other.  It therefore appears to this court that the named plaintiffs are not even similarly situated to each other, much less to the over 1300 opt-in plaintiffs.  *See, e.g., O'Brien v. Ed Donnelly Enters., Inc.*, No. 2:04-CV-00085, 2006 WL 3483956, *4 (S.D. Ohio Nov. 30, 2006) ("Plaintiffs are not 'similarly situated' because each claim would require extensive consideration of the individualized issues of liability and damages."); *see also Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Ore. 2002) ("[A]n action dominated by issues particular to individual plaintiffs cannot be administered efficiently because individual issues predominate over collective concerns.").

The plaintiffs argue that regardless of whether plaintiffs work in different areas on different shifts and don and doff different amounts of protective gear, they are subject to the defendant's general practice of not compensating its employees for donning and

doffing certain protective gear and/or walking to work areas and/or break areas in violation of the FLSA. The plaintiffs continue to argue that Koch has admitted that it follows a common "custom or practice" of not paying for donning and doffing and walk or waiting time by virtue of its assertion of the § 203(o) defense. Thus, according to the plaintiffs, such a common issue for trial eclipses any "minor differences around the periphery of such custom or practice that are argued for requiring 1320 separate trials." However, the court finds that the substantial differences in pay practices, clothing practices, wash practices, work areas, job descriptions, different plants, movement among different plants, jobs, etc. and the many other variances cited above between the multitude of plaintiffs are not "minor differences," which can so easily be ignored in trying this behemoth case.

The plaintiffs continue to argue that the vast majority of the putative class of plaintiffs assert a claim that the continuous workday should begin when they don their smock, hairnet/beardnet and earplugs and should not end until they doff such items at the end of their shift. They rely on this court's preliminary finding on the previous summary judgment motion as to the application of the § 203(o) defense that a genuine issue of fact existed as to the application of the continuous workday rule to their pre-shift, post-donning time as well as post-shift, pre-doffing time. While it remains true that such an genuine issue may indeed continue to exist, it does so as to individual plaintiffs, not across the entire class of such a disparate assemblage. The same is true as to the plaintiffs' washing, walking and waiting time claims.

In view of the disparities set out above, the plaintiffs suggest bifurcate or the creation of subclasses as preferential to decertification. *See Thiessen v. Gen. Elec.*

*Crop.*, 267 F.3d at 1106 (reversing a district courts decision to decertify in a collective action where bifurcation of the case into a liability phase and a damages one was possible.).  However, based on the extreme disparities among the putative plaintiffs and the named plaintiffs set out above, trying to manage this case during a liability phase with so many variances in compensation, clothing, washing and walking practices would be impossible.  It would, of necessity, devolve into dozens of mini-trials on just the liability issue.  Then damages would be an even larger circus of nightmares.  As to sub-classes, such appears attractive at first blush.  However, none have been definitively proposed and the court remains at a loss to see how even this would be manageable, given the canyon of disparities which exist among the various plaintiffs.

The plaintiffs offered supplemental authority regarding the decertification motion on September 28, 2009.  In *Johnson, et al. v. Koch Foods, Inc.*, 2:07-cv-00051 (E.D. Tenn.), Judge Leon Jordan denied Koch's decertification motion in what the plaintiffs characterize as a virtually identical FLSA collective action involving Koch's live processing and de-bone plants in Morristown, Tennessee.  In *Johnson*, the workers apparently sought compensation for the same types of pre-shift, post-shift, and meal break activities at issue in this case.  Koch presented many of the same arguments advanced here for decertification.

However, Judge Jordan found Koch's evidence and arguments to be insufficient to justify decertification, reasoning that Koch's "common policy or practice of paying plaintiffs by production line time is the factor that binds [the plaintiffs] together" and that "[b]ecause of this common factor, the factual differences and the variations in plaintiffs' employment settings do not make this collective action improper." *Johnson* at 8.  The

court further observed that the company's argument "concerning its need to put on individualized defenses carries less weight as it should have a general defense to the use of this common pay practice." *Id.* at 9. Finally, the court observed that "allowing this case to go forward as a collective action takes into account the fundamental purpose of the FLSA by lowering costs to plaintiffs and efficiently resolving the issues in one proceeding." *Id.*

The defendant responds by asserting that the plaintiffs, however, ignore significant procedural and factual differences between this case and the one pending against Koch Foods in Tennessee. First, the size of the opt-in class in this case compared to the opt-in class in J*ohnson* is drastically different. The *Johnson* case only has approximately 150 opt-in plaintiffs where here the court is faced with more than 1300. Second, the operational and size differences between the facilities at issue in *Johnson* and those at issue here are significant. The *Johnson* case involves two smaller plants whose combined operations are comparable at best to those of only one of the plants at issue here - the Morton Slaughter Plant.

Third, and most importantly to this court, the scope of the conditionally certified class is much smaller in *Johnson* than in this case. The class in J*ohnson* is limited to production employees that were paid based on line-time. (Plaintiffs' Supp. Brief Ex. A at 2). The class conditionally certified in this case, however, is much broader than in *Johnson.* Here, the conditionally certified class encompasses all former and current non-exempt employees of Koch Foods' four Mississippi plants who "(I) sanitize themselves and/or (ii) wear, utilize, maintain and/or sanitize any specialized clothing, gear or equipment." Nor does, the class in *Johnson* include support departments, such

-38-

as maintenance and quality assurance and others which are included here.

Also, importantly, unlike the class defined by the court in *Johnson*, the class here encompasses many production department employees that are not paid based on line-time. This includes positions such as "floor persons," "lead persons," "jack drivers," and "set up" employees, all of whom are a part of most production departments but are not paid according to line-time. (Koch Decert. Brief at 13). Moreover, in this case, many production employees who work in various production departments are not paid according to production line-time. Finally, the plaintiffs in the *Johnson* class are subject to only one collective bargaining agreement, which is not the case here.

In denying the motion for decertification in *Johnson*, the district court concluded that the "common policy or practice of paying plaintiffs by production line time is the factor that binds them together." *Johnson* at 8. That certainly is not the case here. This proposed class is defined much broader and contains employees of virtually every hourly paid department at Koch's four Mississippi plants. The employees in *Johnson* could easily be identified as "similarly situated." As the court has explained exhaustively above, such is not the case here.

**Availability of Differing Defenses**

The defendant also argues for decertification on the basis that it will offer numerous individual defenses with respect to the varied claims of the individual plaintiffs. Koch correctly points out that many courts have denied certification after discovery due to potential defenses available to a defendant which cannot be addressed on a class-wide basis. *See e.g., Bayles v. Am. Med. Response of Colo.,*

*Inc.*, 950 F. Supp. 2d 194, 1067 (D. Colo. 1996) (decertifying collective action because case was "fraught with questions requiring distinct proof as to individual plaintiffs" and because defenses "cannot be addressed on a class-wide basis"); *Brooks v. Bell South Telecom., Inc.*, 164 F. R. D. 561, 569 (N. D. Ala. 1995) (denying certification because court "would be faced with numerous individualized defenses"); *see also Thiessen*, 996 F. Supp. at 1084 (acknowledging that conditional certification may be defeated by evidence of individualized defenses).

The plaintiffs argue that Koch's defenses are common to every plaintiff and do not depend on individualized evidence. To support this argument, they point to three of the main issues for trial, i.e.: (1) whether the activities at issue are "work"; (2) whether such activities are "integral and indispensable" under the Supreme Court's decision in *Alvarez*; and (3) whether such activities are *de minimis*.

On the first issue, the plaintiffs insist that this court has already held that whether donning and doffing constitute "work" is an issue common to the trial of every plaintiff. *See Gatewood*, 569 F.Supp.2d at 693-94. While that singular issue may well be common to all plaintiffs, the proof necessary to establish its application to each of the individual plaintiffs with the disparate work, clothing and other practices set out above is another illustration of the inappropriateness of this collective action. The same is true regarding the second issue, integral and indispensable.

Further, this court has previously ruled that the application of the Portal-to-Portal Act defense, which excludes from compensation "activities which are preliminary to or postliminary to . . . principle [work] activities," is an issue of fact for the jury to determine. *Gatewood*, 569 F.Supp.2d at 691-92. Because the plaintiffs wear different

combinations of gear, some required and some optional, which may or may not benefit either a particular plaintiff and/or Koch Foods, a determination of the defense necessarily requires a specific factual inquiry with respect to each plaintiff's claim. *Id.* at 692, (*quoting Dunlop v. City Elec., Inc.*, 527 F.2d 394, 401 (5th Cir. 1976) ("An activity is integral and indispensable when it is 'necessary to the business' and performed 'primarily for the benefit of the employer.'").

Additionally, the court has held that Koch Foods' § 203(o) defense bars certain portions of the claims of plaintiffs covered by a CBA.  However, the proof shows that many plaintiffs are excluded from coverage from the CBAs for some or all of their employment with Koch Foods depending on the department in which they worked, the plant in which they worked, the dates of their employment, and whether or not they were a member of the Union.  As the Eleventh Circuit noted in affirming the decertification of the class in *Anderson*, "the availability of [the § 203(o) defense] to some but not all of the putative class members 'clearly poses significant case management concerns).'" *Anderson*, 488 F. 3d at 954, n. 8.

Finally, it is clear that regardless of whether any activity at issue of a plaintiff is compensable, Koch Foods will likely assert individualized defenses as to each plaintiff who is already paid for some or all of the activities at issue because of the pay practices used by individual plaintiffs' supervisor and the application of those practices to a particular plaintiff.  Koch Foods also can and likely will assert defenses with respect to each plaintiff who claims he or she is not being compensated for actual production work because of the manner in which they are paid and the supervisors' alleged varying management practices.  Thus, the plaintiffs' claims for both alleged unpaid donning and

doffing activities and for activities unrelated to donning and doffing will most certainly require individualized inquiries into work practices and supervisor management decisions that cannot be addressed on a class-wide basis.[25]  *See Stone v. First Union Corp.*, 203 F.R.D. 532, (S. D. Fla. 2001).


## Fairness, Procedure, and Management Issues

The defendant contends that when the court is considering a second-stage decertification motion, it must also be "concern[ed] with coherently managing a trial of the action and presenting evidence in a manner that will not confuse the jury or unduly prejudice any party."  *Thiessen*, 996 F. Supp at 1084.  The court wholeheartedly concurs in this proposition.  Indeed, such concerns are not unique to collective actions under the FLSA, but are of overriding concern in the maintenance of any class action. *See e.g., Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 98 (W.D. Mo. 1997) ("Given the number, magnitude and importance of individual issues [arising in Rule 23 class action], certain class members' voices may be lost amidst the sheer number of fellow plaintiffs — each with a different story to tell.  Conversely, the Defendants will be in a position where it has to prepare for nearly 2000 different trials simultaneously.").  Because of these concerns, the defendant also argues that this action should be decertified.

---

[25]  Koch Foods has asserted that it discovered, as a result of the limited depositions that were authorized under the CMO, that some plaintiffs' claims should be barred by the doctrine of judicial estoppel for failure to disclose the claims in bankruptcy proceedings they commenced during the relevant time. As a result, Koch Foods has filed summary judgment motions with respect to those plaintiffs and it contends that a failure to decertify this case would deprive Koch Foods from asserting this potential defense to individual class members as well.

The court agrees that this collective action would be unmanageable because "this case is fraught with questions requiring distinct proof as to individual plaintiffs." *Bayles v. Am. Med. Response of Colo., Inc.*, 950 F. Supp. at 1067. "Indeed, a collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. It is oxymoronic to use [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability." *Id.*; *see also Lusardi*, 122 F.R.D. at 466 (sheer number of witnesses that would be required to prove individual issues unmanageable). As the *Thiessen* court observed, "[t]here is simply a realistic limit on what a jury may reasonably be expected to absorb, retain and process." *Thiessen*, 996 F. Supp at 1084; *see also Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. at 98 ("[N]either party can seriously expect a jury's full attention and consideration for the length of such [class action] proceedings, nor can they expect evenhanded, consistent treatment from beginning to end.").

If this case proceeds as a collective action, the court has concerns as to the due process rights of the defendant. In *Lusardi*, the court carefully analyzed the due process ramifications of proceeding with a single trial against Xerox, which would incorporate the claims of more than 1300 plaintiffs. *Lusardi*, 118 F.R.D. at 370-73. Recognizing that the Supreme Court has held that both civil actions and statutorily created defenses are property interests protected by the Due Process Clause of the Fifth Amendment, the court ultimately held that the plaintiffs' proposal would constitute an unconstitutional deprivation of property because the collective action mechanism would effectively prevent Xerox from defending the claims in a meaningful way. *Id.* at

371 (*citing Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) and *Martinez v. Cal.*, 444 U.S. 277, 282 & N.5 (1980)).  The court reasoned that

> [t]o proceed without permitting Xerox to raise at the liability stage of trial each and every defense available to it where each potential class member is readily identifiable and must step forward in order to assert and prove an individual claim for liability or at least be the subject of a defense particular to each such plaintiff would deprive defendant of the Fifth Amendment right to due process.

*Id.* at 471.

On remand, the *Lusardi* court again emphasized the necessity of allowing Xerox a reasonable and meaningful opportunity to defend.  "The disparate individual defenses asserted by Xerox heightens the individuality of the claims and complicates the significant management problems."  *Lusardi*, 122 F.R.D. at 466.  Similarly, the second-stage decertification in *Anderson* was upheld, largely because of the differing defenses available to the defendant.  *See Anderson*, 488 F.3d at 954 & n.8 ("In addition, as a practical matter, the availability of defenses to some but not all of the putative class members clearly poses significant case management concerns.").

The court finds that given the plethora of individual issues raised by both the plaintiffs' claims and Koch Foods' defenses, the trial of this collective action is unmanageable and presents serious fairness issues — issues that simply cannot be overcome on the facts presented here.  As such, decertification is appropriate, and the opt-in plaintiffs' claims should be dismissed.  *See Keef v. M.A. Mortenson Co.*, No. 07-CV-3915, 2009 WL 465030, *2 (D. Minn. Feb. 24, 2009) (decertifying action and dismissing without prejudice opt-in plaintiffs).

**<u>Severance of the Named Plaintiffs</u>**

As a final matter, the defendant argues that this court should find that the named plaintiffs' claims have been improperly joined and order separate trials.  Federal Rule of Civil Procedure 20(a)(1) allows plaintiffs to join in one action where either (1) "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences, or (2) any question of law or fact common to all plaintiffs will arise in the action."

The defendant asserts that the named plaintiffs' claims do not arise out of the same transaction or occurrence and that each of the five named plaintiffs who actually worked in one of Koch Foods' four Mississippi processing facilities worked in different locations, performing different jobs, in different departments, wearing different protective clothing, with differing donning and doffing practices.   The court agrees and finds that, more importantly, the named plaintiffs were subject to different compensation practices of different supervisors in different locations and that any potential common questions of law or fact will pale in comparison to the particularized, individual inquiries that will be required to prove each of the named plaintiffs' claims.  As such, the court concludes that joinder is improper and each of the named plaintiffs' claims should be severed and tried separately.

The burden to demonstrate that the class should remain certified is on the plaintiffs, and "in order to overcome the defendant's evidence, a plaintiff must rely on more than just 'allegations and affidavits.'"  *Morgan v. Family Dollar Store, Inc.*, 551 F. 3d 1233, 1261 (11th Cir. 2008) (quoting *Anderson v. Cagles, Inc.*, 488 F.3d at 953 ).  The plaintiffs have failed in this burden and have offered no evidence demonstrating that final certification is appropriate.  Indeed, the plaintiffs simply re-filed affidavits and

evidentiary submissions submitted in opposition to Koch Foods' previous motion for summary judgment based on § 254(a) and § 203(o) of the FLSA.  This is inadequate to meet their burden to maintain the conditional certification previously granted in this case.

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion to Decertify and Sever **[#95]** filed on behalf of the defendant is granted and the Conditional Certification Order previously entered in this matter is set aside and this matter is decertified and all opt-in plaintiffs are dismissed without prejudice.

IT IS FURTHER ORDERED AND ADJUDGED that the claims of the remaining five named plaintiffs Briscoe, Lopez, King, Davis and Gatewood are severed and shall be tried separately.  This matter shall be transferred to the original judge or judges assigned to the case for further proceedings consistent herewith.

SO ORDERED AND ADJUDGED this the 20th  day of October, 2009.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE